No. 47.—JANE SMITH, caveator, plaintiff in error, *vs.* WM.
J. DUNWOODY *et al.* propounders, &c. defendants in error.

[1.] James Smith left to the caveator, his wife, Jane Smith, for life, $500
annually, to be paid her with the annuity left her by her former husband; the
choice of any five of his house servants; the right to occupy any of the
places he might die possessed of, with twenty acres of land, and the build-
ings attached thereto, including the furniture therein, with carriage, and
horses, and stock; $450, the price of one of her negroes sold by the testa-
tor, together with all the monies she may have in her possession for safe-
keeping, at the time of his death, to be in lieu of dowry claims; if she
wishes it, annually, during her life, a supply of provisions for her house-
hold, from his estate. If his child, E. W. Dunwoody, survives his wife, all
these privileges to be turned over to her; to whom, also, he gives his
Brighton Summer Seat in McIntosh County, in fee-simple; on the death of
his wife, the $500 directed to be paid to her annually ceases, and then this
sum is to be paid to certain named heirs of his deceased brother, Wm.
Smith—each to receive $100. The gold watch left to testator, by his de-
ceased brother, he gives to his son, James L. Smith. All lands owned by
him at his death, within three miles of his Sidon estate, shall be consid-
ered as an appendage to said estate, with all the negroes thereon, and all
others belonging to him at the time of his death, whether lent or hired out;
and this to be considered his *general estate,* and to be kept *in perpetuity.*
As neither of his heirs is competent to purchase the said grounds, and his
mind revolts at the idea of division and separation of families, the annual
income of said estate, after providing for the bequests to his wife and daugh-
ter, and all necessary plantation expenses, to be divided equally, share and
share alike, between his grand-sons, Wm. J. Dunwoody, Dean M. Dun-
woody and John F. Dunwoody, them and their heirs forever, and to his
two grand-daughters, J. A. Jones and Mary E. Dunwoody, to them and the
heirs of their bodies, as they may direct by will, and to his great grand-
child, C. E. M. Shackelford, to be disposed of in the same manner as is
provided in a certain deed of gift to her, which is described; estimates the
annual product of his estate at $9.000, and directs (as soon as after making
provision for antecedent bequests and plantation expenses) the sum of $6.000
to be raised, and as has been distributed as before provided, that out of the
excess his executors shall give, annually, to each of his negroes above the
age of seventeen years, the sum of $5; and $100 to be annually appropria-
ted in aid of the ministry of the Baptist denomination, the recipient to give
his services at least twice a month; the chapel on the estate to be kept in
good repair. For the gradual emancipation of his negroes, provides, that
upon his decease, an annual register of births on his estate to be kept, and
every tenth negro born shall, at the age of eighteen years, have the option
of having his freedom; and if he accept it, shall be turned over to the Col.

Smith, &c. *vs.* Dunwoody *et al.* &c.

Society U. S. America; nominates eleven executors; in the event of a vacancy, remaining executors may appoint, at their annual meeting, recommended to be on the first Monday in April. If they fail, any of the Courts and authorities of McIntosh may appoint; recommends the appointment of one of the executors as superintendent, at a salary not exceeding $1.000, who is to keep a book, and when approved at the annual meeting, is to become a record; requests his executors not to charge commissions; any property, that is, monies at interest from bonds, notes, accounts, houses, lands, found to be his and not included in that left in perpetuity, to be equally divided between his three grand-sons, share and share alike, to them and their heirs forever, but not to interfere with the provisions for his wife and daughter. Upon the construction of this will: *Held,* 1. That a part of the provisions of this will are valid and can be executed; and others illegal, because they require the estate to be kept together *in perpetuity,* in order to carry them out. 2. That the trust term will continue in the executors, in whom it vests, *as such,* just so long as it is necessary to accomplish the legitimate purposes of the will, and not a moment longer. 3. The bequests to the wife and daughter require the trust to continue, certainly to the death of Mrs. Smith, if not until that of Mrs. Dunwoody, unless otherwise accommodated. 4. The income of the *general estate,* being devised and bequeathed to his five grand-children and his great grand-child, with certain deductions to be made therefrom, provided it exceeded $6.000, indefinitely and without limitation of time; and there being no disposition over of the *corpus* to any one else, these devisees and legatees took an absolute fee in the capital of said estate, the possession of which was postponed until the valid purposes of the trust term were effectuated. 5. If a gift of slaves be coupled with a provision, that every tenth of the future increase be emancipated, the condition is void, as repugnant to the rights of property and the estate granted.

Caveat, in McIntosh Superior Court. Decided by Judge FLEMING, Spring Term, 1855.

The Will of James Smith, was as follows:

McINTOSH COUNTY, STATE OF GEORGIA:

In the name of the Holy Trinity, the *Father, Son* and *Holy Spirit*:

This *first* (1st) *day of December, One Thousand Eight Hundred and Fifty-three,* (1853) I, *James Smith,* of sound mind and memory, of said County and State, being far advanced in age, and must shortly depart from this life, deem

it right and proper, both as respects myself and family, I should make a disposition of all the property which a kind Providence has blessed me; I therefore make this my last will and testament, in the simplicity of words, as to avoid all technical words or sentences touching the same, and in no instance it must be understood otherwise than my express will and demise; nor shall any lawyer, Court or Legislature, have, directly or indirectly, have anything to do with it, in its explanation or adjustment of the same; otherwise, should an occurrence happen (among such as would be called wise among my heirs) as to create a difference of understanding my views, then, and in that case, a choice of five (5) of the most disinterested persons may be made choice of, such as not hearing the parties on either side expressing their ʌiews, until the question or difficulty comes up before them for judgment or adjustment, whose decision is made final to the question submitted, as if settled by myself; and those five disinterested friends, shall be selected from each of my executors; having named one (each;) whose names to be thrown into a hat or box, and the five first drawn out shall be the person thus chosen; and I, James Smith, make this my last will and testament, and do hereby revoke and annul all others heretofore made by me, touching all matter and things having a bearing upon all my worldly interest.

First. I, James Smith, recommend my soul to God, my Father and Creator, beseeching him to receive it in mercy, and judge it not according to its merits, but according to the merits of Jesus Christ our Lord, who offered himself as a sacrifice to God his Father, for all his elect, according to his purpose, unworthy as we are—I, myself, among the chief of sinners. Thus I implore Almighty God to pardon all my sins and transgressions, and thank him for the good hope I entertain, through Christ, I shall be delivered therefrom under those views. I desire that my body be buried in a decent and christian manner, suitable to my circumstances and condition, avoiding all such useless forms and fashions, which does not comport in glorifying God and the christian profes-

sion; my soul I humbly hope and trust may rest with Him who gave it in an eternal salvation, through that blessed Lord and Saviour Jesus Christ, who's religion I have professed, and humbly hope and trust, enjoyed for many years, and formed a comfortable and abiding hope.

I, James Smith, desire that all my debts be paid without delay, by my executors, (hereinafter) named, as I am unwilling my creditors should be delayed from their just dues; especially as there will be no necessity for it. I, James Smith, give and devise to my dear wife (Jane) should she survive me, (during her life) for her support and comfort, in and from the following provisions herein made, to-wit: In the first place, the amount of Five Hundred Dollars ($500) annually paid her; this, with the annuity paid her semi-annually, left her by her former companion (in life) with the following, to say, the choice of any of my house servants, to the number five, with privilege of the occupancy of any of my places dying possessed of; to say, Welharn (Cobb County) Brighton and Sidon, McIntosh County, embracing the ground of twenty acres, attached thereto, as only to embrace within the same all such buildings as attached to the dwellings for her choice of residence, including all such furniture found therein, with my carriage horses, carriage and stock of all kinds; this for her comfort during life. And as in our connection was formed, she owned a negro woman, (named Lucy) finding her a supernumerary (among others in my house) as well as naughty in her character, (in our domestic relations, it was unanimously agreed upon in the sale of her thus, the sum of four hundred and fifty ($450) dollars could only be obtained for her,) which sum, ($450) with all other moneys she may have in safe-keeping for me, (at my death) shall be paid over to her (as cash) independent of any other provision made her in this, James Smith's last will and testament, to be applied by her, as may be expedient, in her wisdom and good judgment. In all this arrangement for my dear wife, shall be considered as sufficient for covering all dowry claims that may arise in her behalf, being a full compensation for the same. Again,

Smith, &c. *vs.* Dunwoody *et al.* &c.

in addition to the above provision made my dear wife, (Jane) she shall be entitled, annually, during life, (if wished for) a support of provisions from my estate, James Smith, as sufficient to support her household.    In the event my dear child, Mrs. Elizabeth West Dunwoody, should survive her, (my dear wife Jane,) all of those said privileges (as above stated,) to-wit: In the occupancy of any of my places as named, my carriage, horses, stock of all kinds, the choice of five of my house servants, shall be turned over to her, my dear child, (E. W. Dunwoody) in like manner, and arranged as to be enjoyed, as if more particularly specified, during her life.    My Brighton (summer seat,) McIntosh County, with all the lands adjoining, to say as per survey, containing about five hundred (500) acres, (see plat) with all its appendages, &c.    I, James Smith, bequeath and give to my dear child, E. W. Dunwoody, in fee simple, to her and her heirs forever.

I, James Smith: It is my will and desire, after the death of my dear wife, (Jane) the sum of five hundred ($500) be paid over to the heirs of my deceased and ever to be remembered brother, (William Smith) to-wit: Doct. Sidney Smith, James L. Smith, Sarah W. Smith, Elizabeth W. Smith and Hannah M. Smith, to share and share alike, this said five hundred ($500) dollars, each receiving one hundred ($100) dollars of it, to them and their heirs forever, as a small testimony and regard for his memory, as well as the gold watch left me at his decease, I give to his son, Jas. L. Smith, at my death.

I, James Smith, wills and devise, that all the lands owned by me at my death, within three (3) miles of my valuable estate, named and known as the Sidon estate, made up of sundry surveys and grants, (as reference will show,) to be considered as an appendage of said estate, with all the negroes or slaves thereon, as well as all others found to be mine at my decease, whether loaned to my several grand-children or great grand-child or children, as well as hired out, (as if named) shall be considered as my general estate, to be kept in perpetuity, from the circumstance of neither of my heirs are competent the purchase of said

grounds constituting said estate, as to make a division; and' my mind revolting in the separation of their families, for a division among them, thus I, James Smith, under that view and feeling, the following is my will and devise, for the annual appropriation of all the annual income arising out of said estate, (those excepted in the provision made for my dear wife (Jane) and my beloved daughter E. W. Dunwoody, during their lives,) to-wit: I, James Smith, wills, after all necessary plantation expenses or disbursement are met or paid' off, with the several provisions made for my dear wife (Jane,) as before expressed, (regarding economy,) to be divided in the following manner, (reserving such amounts as will be hereafter herein named, for other purposes required,) equally, share and share alike, between my following children, grand and great grand do. to-wit: My grand-sons, Wm. J. Dunwoody, Dean M. Dunwoody and Jno. F. Dunwoody, to them and their heirs, forever, and to my two grand-daughters, Mrs. J. A. Jones and Mary E. Dunwoody, to them and the heirs of their bodies; and in the event of no heir or heirs of their bodies, then and in that case, such a distribution as their wills and desire may make; and to my great grand-child, S. E. M. Shackelford, to come under the same rule of disposition as that provided for her in a deed of gift of sundry negroes, found recorded McIntosh County Superior Court, book, K, folio 260, 21st March, 1853, referring thereto; I, James Smith, bearing in mind the past blessings a kind Providence has afforded me, from the success of labor and culture of this said estate, and in anticipation of the future bearing testimony to the fact; from the same care and attention, a safe calculation can be made, of an average crop from ten to twelve thousand bushels rice can be annually calculated on, (Providential visitations excepted,) thus, the amount of $9000 might be annually expected, for all of the above arrangement; reserving, as beforesaid, an amount to meet, as will be stated. Thus, then, I, James Smith, wills, that as soon as six thousand ($6000) dollars is made subject to meet all the foresaid arrangements, paying off, first, plantation disbursements, my

dear wife (Jane) her annuity, with the four hundred ($450) and fifty dollars returned her for the amount the said servant Lucy sold for, (as stated,) then, and in that case, I, James Smith, wills that the keeping in view the five hundred ($500) dollars, provided for the said children of my beloved and departed brother William, as before named, coming under the rule or arrangment made for its payment, not to be lost sight of, then, and in that case, I, James Smith, wills, so soon as that sum of six thousand ($6000) dollars is made subject for such provision meeting all other requisitions as stated; it is then enjoined upon my executrixes and executors, (as will hereafter named,) pay over from such sums of money, over the said six thousand ($6000) dollars, or so much of it as to give each of my servants or slaves, annually, (so long as such moneys can be obtained,) each one, over the age of seventeen years, (remembering the superannuated among them,) as a small testimony of my regard for them, this for their little comfort: to say, five ($5) dollars each; as well as in remembrance of their spiritual relations, I do, James Smith, wills, that one hundred ($100) dollars be annually appropriated in aid of the ministry, (of one of good report,) of the Baptist denomination, (as being preferred by them,) whose labors, for this sum appropriated, shall give his labors at least twice in the month.    The chapel on the estate, to be kept in good repair.

As my mind has long been exercised, not from any view that slavery is to be considered a sin, but otherwise, fully justified from the oracles of truth, that I, James Smith, wills, that provision for them, that their situation might be measurably meliorated, or make better their situation gradually, that will prove in time, (measurably) a better condition for them.

Thus, for that end, I, James Smith, for their gradual emancipation, the following provision I do hereby make for them, in this my will, to-wit: that after my decease, an annual register will be kept of all the births occurring on said estate, the same being recorded in the annals of the county, in such

Courts and records of the same having cognizance of such public matters, as the county requires, and that every tenth (10th) birth, at the age of eigh(18)teen years of age, shall have faithfully made known to him or her (as the case may be) this arrangement or provision made for carrying out this my object; and in the event of such accepting of it, such shall be made known or reported to the society called the Colonization Society of the United States of America, for the purpose of providing and arranging for their freedom, (of all those accepting,) and turned over to the said society, coming under this rule; and should such reject this provision made, then and in that case shall continue in slavery; if a female, it shall not exclude or deprive her issues in coming under the rule so provided; such coming under this provision, shall be supported as the rest of the slaves, until the said age of eighteen (18) years so required for their choice, either to accept or refuse.

And in conclusion of this, James Smith's last will and testament, for carrying out all the requisitions therein named, do hereby appoint and nominate the following persons as my particular relatives and friends, as my executrixes and executors, to say: My dear wife, (Jane) my daughter, Elizabeth W. Dunwoody, my executrixes, with the following, my three grand-sons, (as if named,) with those of my particular friends, to-wit : united with them, the Rev. John Jones, John Dunwoody, (sen.) of Roswell, Cobb County, James H. Couper of Glynn County, of (Hopeton), Alexander Mitchel, of Darien, McIntosh County, James Jones, of Liberty County, William R. Gignilliat, of McIntosh County, as my executors and executrixes, to this my last will and testament, touching all and every thing herein expressed; and in the event of vacancy, wanting the number as nominated herein, (to say, 11,) the remaining number at their annual meeting, on said estate, (which is recommended to be on the first Monday of April,) shall appoint such one or more, if required, to fill such vacancy; to fail in doing so, any of the Courts or authorities of McIntosh County are permitted to do so; and

in either case, to be as binding as if done by me, James Smith.

I, James Smith, for the harmony, peace and good feeling of all parties interested, that at the annual meeting on said estate by these my executors and executrixes, for the arrangement and adjustment of said estate, to appoint one for the superintendency of it annually, for whose services the sum not over one thousand ($1.000) dollars shall be appropriated as to cover overseer's wages and his superintendency, whose duty is to keep a day-book of all accounts, &c. emanating for and against said estate, &c.; and when approved of at the annual meeting, (on said estate,) after being approved of and signed by the acting ones, it shall be made a record on the county, for such having any interest therein.

In conclusion, I, James Smith, must beg the pardon of those my friends, as herein named, as my executors and executrixes, although the laws of the State make provision for their commissions under such appointments, I must say, from so many divisions provided for, &c. I must beg, here, not to admit; and thus, throw myself on their clemency, for my rejecting any commission being claimed or charged by them. And as regards any other property I, James Smith, may be found possessed at my death, as not included in that left in perpetuity, to-wit: monies at interest, either from bonds, notes, accounts, houses, lands, &c. shall be equally divided between my three grand-sons, to say: William J. Dunwoody, Dean M. Dunwoody and John F. Dunwoody, share and share alike, to them and their heirs forever, so as not to interfere in any arrangement from that provision made for my dear wife, (Jane) as well as for my daughter, (their mother,) E. W. Dunwoody, as stated in this my last will and testament, as, witness my hand and seal to above date.

Test—                                        JAMES SMITH.

CHAS. H. McINTOSH,
THOS. S. BOND,
J. ROCKENBAUGH,
                Not. Public.

Upon *caveat* to this will,. the following special verdict was taken, by consent:

In the matter of the last will and testament cf James Smith,. application by Wm. J. Dunwoody, Dean M. Dunwoody and John F. Dunwoody, three of the executors named in the said will, to prove said will and testament, in solemn form, and to admit the same to record, decision by the Court of Ordinary, and appeal therefrom by the caveators to the Superior Court, we, the Jury, impannelled to try said case upon the appeal, do find that the said last will and tesment of the said testator, James Smith, was signed by the said testator, in the presence of three credible and competent witnesses, who, at the request of the said testator, and in his presence, and in the presence of each other, subscribed the said last will and testament, as attesting witnesses thereto ; that the said testator, at the time of signing said will, was in his right and proper mind, and that the said will was, in every respect, properly and legally executed by the said testator, so far as the formal execution is concerned. And, further, if the Court shall be of opinion, and shall decide, that upon the law arising on said will, the said will is good and legal, and. capable of legal operation and effect, then we find for the will and the propounders thereof, and that the same be established as the last will and testament of said James Smith, and be admitted to probate and record ; but if the said Court shall be of opinion, and decide that the said will cannot be supported according to law, and cannot operate consistently with the laws of the land, then we find for the caveators and against the will, and that the same be set aside and probate and record thereof be refused.

Upon this verdict, Judge FLEMING decided as follows:

The special verdict in this case, and which was rendered with the consent of the parties, disposes of the first ground of the caveat, to-wit: that the paper offered for probate as

the will of James Smith, was not executed by the testator according to law.

The questions made and argued, and which I am called upon to decide, arise under the third ground of the caveat, viz: " that the provisions of the said will are contrary to the laws and policy of the State of Georgia, and cannot legally be carried into effect."

The provisions of the will referred to in this ground of the caveat, are the clause providing that the Sidon estate shall be "*kept in perpetuity*," and the clause providing, or rather, professing to provide for "*gradual emancipation*." The will, in my judgment, does provide that the Sidon estate shall be kept in perpetuity, and I have no difficulty in saying that this provision is illegal, and absolutely null and void. The clause as to emancipation, is also void, because it necessarily depends upon the perpetuity clause. The provisions of the will are such that the Sidon estate must be kept in perpetuity, or the clause as to emancipation cannot be carried out. This, it seems to me, cannot fail to appear to the most superficial reader of this will. If this be so, then it is unnecessary to consider the question whether the emancipation provided for in this will be domestic or not. That question can only become important in the event that the emancipation clause could be so separated from the perpetuity clause, as not to dependent upon it for its execution. But this is impossible, and the will itself is the best argument to prove it. The next question in order is, whether the will, being void in part, is void altogether. This question has been decided in a recent case by the Supreme Court of Georgia. Judge LUMPKIN says: " And although void as to the emancipation clause, so as to create an intestacy as to the slaves, *it may, neverthe-theless, be valid*, as to the other items. By the 17th section of the 1st article of the Constitution, it is provided that no law or ordinance shall pass, containing any matter different from what is expressed in the title thereof; and yet, no Court in Georgia has ever held that the whole Act was a nullity,

but only so much and such parts thereof as were obnoxious to this constitutional inhibition." (16 *Ga. R.*)

A will, then, void as to some of its items, may yet be good and valid as to other items. What, then, let us inquire, is the fact in regard to the will before me? Setting aside the perpetuity and emancipation clauses, has Mr. Smith disposed, by will, of the whole or any part of his property; or, has he died intestate, as to the whole or any part of his property?

For the answer to this question, I propose to look *strictly to the will itself.* I shall not assume the most delicate and responsible office of "making another will for the testator, when his declared intention *necessarily* fails." It is my purpose to let the will speak for itself.

The provisions of the will in favor of Mrs. Smith, are free from all objections. She has, by the will, an annuity of five hundred dollars. She has the choice of her house servants, the choice of living at Welham, Brighton or Sidon, with the use of the furniture that may be found at the place of her choice, also the use of carriage and carriage horses, and the use of the stock of all kinds: "this for her comfort *during life.*" There is also given her the sum of four hundred and fifty dollars, "with all other monies she may have in her safe keeping" at testator's death. These provisions in her favor to be in lieu of dower. There is also given her annually, during life, (if she wishes it,) provisions from the plantation for her household. In all this there is certainly nothing illegal or impossible. These provisions of the will must, therefore, stand as part of the last will and testament of James Smith.

The will then proceeds to provide, that in the event Mrs. Dunwoody, the daughter of testator, should survive Mrs. Smith, then certain privileges granted Mrs. Smith during life, should be "turned over" to Mrs. Dunwoody, to be enjoyed by her during life. The Brighton Summer Seat, containing about five hundred acres, is given in fee simple to Mrs. Dunwoody "and her heirs forever." The sum of five hundred dollars is given to the children of his (testator's) deceased brother, share and share alike. Testator gives his gold

watch, which had been left him by his brother, to James L. Smith. So far, we have seen nothing illegal or impossible. These items of the will are good and valid, and so far as these items have disposed of property, Mr. Smith certainly has not died intestate. These items, however, dispose of but a small, very small, part of his property. The great bulk of his estate remains yet to be disposed of, and the question is, what disposition has he made of it, or, rather, the question is, has he made any disposition of it ? or, has he died intestate as to the balance of his property ?

This question arises under the following clause of the will : (Here followed the clause.)

I propose to give, in my own language, what I believe to be a true abstract of this clause of the will :

First. Mr. Smith provides, in this clause of his will, that his Sidon estate, consisting of certain lands and negroes, shall be considered as his general estate, and kept together *in perpetuity;* that is to say, never to be alienated or divided.

Second. The reason why he wishes this estate kept in perpetuity is, because, in his opinion, neither one of his heirs is able to purchase the shares of the other heirs, and he is not willing that the family ties among his negroes should be broken by a division.

Third. He provides that the annual income of this estate, subject to certain charges, shall be divided, share and share alike, between his children, grand-children and great grand-children, naming them. He says children, but does not name any child, but only grand-children and great grand-child. The gift to his great grand-child is upon the same terms as are mentioned in a deed of gift of sundry negroes, to said great grand-child, to be found on the records in McIntosh Superior Court.

The above is, I believe, a true abstract of this clause of the will. The first provision, that the Sidon estate shall be kept in perpetuity, I have already decided to be null and void. True, it was contended in the argument before me, that this

was no perpetuity. But the testator has used the word per-
petuity, and I must suppose that he used it according to its
legal meaning and effects. If I could gather from the words
used by the testator that there was any period within his con-
templation when this property could be alienated, and if that
period was within the bounds prescribed by law, I would
cheerfully suppose that he had used the word in that limited
sense. But there was evidently no period in the mind of the
testator in reference to which this word was used. On the
contrary, we find him in a subsequent part of this will, pro-
viding for the filling of vacancies in the number of his execu-
tors, which, if carried out, would secure a perpetual succes-
sion. The very reason which he gives for this perpetuity
clause shows that he meant what he said—a perpetuity ; for
the reason he gives is, that no one of his heirs can purchase
from the others, and his mind revolts at the idea that his
slaves should be separated. Not that they should be separa-
ted within a given time, but that they should *ever* be separa-
ted. It is, I apprehend, in accordance with this feeling, that
he makes provision for perpetual succession among his exec-
utors.

The third and last item in this clause of the will is, the gift
of the income to his grand-children and great grand-child.
Caveators, I know, deny that the income is conveyed. This
question I will consider hereafter. Assuming, for the present,
that the income was conveyed, what is the legal effect of such
conveyance? Does it convey the principal?

The question has been, as I conceive, decided by the Su-
preme Court of Georgia, in the case to which I have already
had occasion to refer. I quote that decision at length upon
the point. (Here follows the decision upon Bledsoe's will.)

This decision is so full to the point, that a gift of the in-
come of property without limitation, is an absolute gift of the
property itself, that I deem it unnecessary to refer to any
other authority.

This brings me to the question, has Mr. Smith given the

Smith, &c. *vs.* Dunwoody *et al.* &c.

income of this property, without limitation as to time, to his grand-children and great grand-child?

His will is, that " *all* the annual income arising out of said estate," be given to his grand-children and great grand-child, share and share alike, subject to certain deductions, which I will hereafter notice, to his grand-sons, and "*their heirs forever*;" to his grand-daughters and the "*heirs of their bodies*;" and in the event of no heir or heirs of their bodies, then, and in that case, such a distribution as their wills and desire may make;" and to his great grand-child, upon the same terms as are mentioned in a " deed of gift of certain negroes," which deed is upon record in the McIntosh Superior Court. This is certainly a gift of *all the income*, without the limitation of time, unless the effect of his words is prevented by the deductions from that income, for which he has provided. The argument here is, that the income is not conveyed, because, if so, then the other legatees are cut off, there being no fund to pay. Is this so?

He bequeathes the sum of four hundred and fifty dollars, absolutely, to his wife. Is this inconsistent with the gift of the income to others? I think not—certainly not more inconsistent with a gift of the income than with a gift of the property itself.

May not a man give his property to A, and incumber it with a debt of four hundred and fifty dollars, or any other sum, to B? And when the debt is paid, is not the property the property of A? And why may not the income of property be given in the same manner? And when the debt is paid, does not the income belong to the person to whom it is given?

He also bequeaths to his wife an annuity of five hundred dollars during life, and after her death this annuity is to be paid to his daughter during life. What is this but a charge upon the income—not a perpetual charge—it is limited to the lives of his wife and daughter; it is nothing more than a debt, for which he has thought proper to make his legatees chargeable. It is no more inconsistent with an absolute gift of the income,

or of the property itself, than that other item of his will, which directs his executors to pay his debts without delay. As well might it be urged, that the income is not given, because if so, then creditors must go unpaid; for there would be no fund with which to pay.

There is, also, a bequest of five dollars, annually, to each of his negroes, over the age of seventeen years; and also, the sum of one hundred dollars, annually, to be paid to a Baptist preacher, of good report, who, for said sum of one hundred dollars, " shall give his labors at least twice in the month, in the chapel on the estate to be kept in good repair." These bequests depend upon the perpetuity clause in this will, and for that reason they are null and void. Being null and void, they cannot affect the gift of the income, or of the property.

But it is argued that this income is given upon the *condition precedent* that the estate shall be kept *in perpetuity*, and that the condition being void, the gift is void also. It is further argued, that the general intent of the testator was to create a perpetuity; that this general intent being void, the whole will is void ; as the whole will but points out the mode and manner in which the testator wished this general intent to be carried out.

What reason does the testator give for wishing this property kept in perpetuity ? The reason is, that neither of his heirs is able to purchase it from the other heirs, so as to prevent a separation of families among his negroes. What, then, are we to infer ? That if any one of them had been able to make the purchase, he would have bequeathed and devised the whole to him, charged with the proportionate shares of the other heirs and legatees. Under these circumstances, a separation among the negroes might take place, but the testator would have no connection with it. He would have done what he conceived his duty in the premises, and the separation, if it took place, would be the act of another. In other words, the testator would have given the whole Sidon estate, land and negroes, to one, if there had been one among his heirs able, in his judgment, to pay the other heirs their pro-

portionate shares.   In this there would have been no perpetuity.   Under such circumstances, the testator would not have felt it his duty to provide for a perpetuity.   From this I infer that the great object of the testator was, that his heirs and legatees should have this property.   His humane feelings, however, revolted at the idea that his negroes should be separated by any act of his own; he would, therefore, in the first instance, have left all his negroes to one of his heirs, he to pay the others their proportionate shares, if, in his judgment, there had been one among his heirs able to do so; but not thinking this, he leaves the income to be equally divided between them, believing, I doubt not, that in this way the negroes would be kept together; but not, as I think, upon the condition that they should be kept together in perpetuity; for if, in his judgment, there had been one among his heirs able to take all, such would have been his will, and we would never have heard of a perpetuity.   This is not a matter of inference, it is what he himself says; his language is, that the Sidon estate "shall be considered my general estate, to be kept in perpetuity," (now why?)   "from the circumstance of neither of my heirs are competent to the purchase of said grounds constituting said estate."   If, then, either one of his heirs had been able to purchase, he would not have desired a perpetuity.   He was evidently willing to leave the question of a separation among his negroes with either one of his heirs, if, in his judgment, there had been one among them able to pay the others their proportionate shares.   This, in my judgment, is the legitimate and necessary effect of the language he has used.   My judgment then is, that this Sidon estate is, by this will, bequeathed and devised to the grand-children and great grand-child of the testator, share and share alike, encumbered with certain charges in favor of his wife and child, which charges will cease upon their death.

Upon this decision, the following errors are assigned:

1st. Because the Court erred in deciding, that upon the whole law arising on said will, that the said will was good and legal, and capable of legal operation and effect.

2d. That the Court erred in not deciding that the will was void, on account of its conflict with the Statutes of the State on the subject of emancipation.

3d. Because the Court erred in not deciding that the provisions of the said will, with regard to the Sidon estate, and the property connected therewith, were void, on account of their conflict with the laws of this State, regarding perpetuities.

4th. Because the Court erred in deciding that the emancipation clause was rendered nugatory by the perpetuity, whilst the perpetuity itself was inoperative, as against other provisions of the will.

5th. Because the Court erred in deciding that, under the provisions of the will, the Sidon estate, in said will mentioned, descended, in fee simple, to the grand-children and great grand-child of the testator, with certain incumbrances.

Judge McDonald being related to a party in interest, did not preside in this cause.

WARD & OWENS; LLOYD & OWENS, and T. R. R. COBB, for plaintiff in error.

LAW & BARTOW, for defendants in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The questions arising upon this record have been so soundly and satisfactorily treated by our brother FLEMING, that we are disposed to adopt his decision as the opinion of this Court, with some slight modifications.

And without pausing to examine, critically, the vast treasures of learning and authority adduced in this discussion, we submit this simple, common sense, and as we think, legal view of the case.

The testator gives the whole of his estate, real and personal, in perpetual trust, to his executors, *as such*, for the purposes therein mentioned. The *income* of the whole estate, is

devised and bequeathed to certain devisees and legatees, to-wit: his grand-children and great grand-child, subject to certain specific provisions.    Many of these charges are legal and can be executed; others are illegal, because they require the estate to be kept together in perpetuity, and for other reasons; and consequently, cannot be carried out. This being the case, what is to be done?    Does the whole will fail, and intestacy supervene?    Surely not.    The only result is, that the trust term will continue in the executors just so long as it may be necessary to accomplish the valid purposes of the will, and not a moment longer.

The testator gives his wife $450 in cash, in lieu of her woman Lucy, whom he had sold, "because she was a supernumerary in his household, and naughty in her character." This sum was, of course, to be paid her immediately.    Besides the annuity left her by her former husband, *he* gives her an annuity of $500, together with the choice of five servants, and the privilege of occupying any of the places of which he might die possessed, with an annual supply of provisions from his estate for the support of herself and household.    These bequests of the annuity and provisions, being a charge upon his whole estate, the whole must be kept together by the executors, for the purpose of raising the money and furnishing the provisions, unless some compromise arrangement can be be effected with the legatees.    The annuity of $500 left to his wife, ceases at her death; and then this sum is to be paid to certain named heirs of his deceased brother, Wm. Smith, each to receive $100.

Next he gives Brighton in fee to his daughter, Mrs. Dunwoody; and should she survive his wife, all the privileges given to his wife are turned over to his daughter.

These bequests, therefore, require the trust to continue until the death of Mrs. Dunwoody, unless the same, as before intimated, can be otherwise accommodated.

Now two things are undeniable: First, that no perpetuity was needed to carry out these provisions.    They terminate with two designated lives in being, to-wit: that of Mrs.

Smith and Mrs. Dunwoody. Secondly, That the whole of these dispositions being for the life only of his wife and daughter, are entirely consistent with the subsequent bequest of the fee, which the testator afterwards made to his lineal descendants. Has he made such bequest?

He first provides that all the lands owned by him at his death, within three miles of his Sidon estate, be considered as an appendage to said estate, with all the negroes thereon, and all others belonging to him at the time of his death, whether lent or hired out; and he declares that this shall constitute his *general estate*, to be kept *in perpetuity*. And for the annual appropriation of *all the annual income* arising out of said estate, (those excepted in the provisions made for his wife and daughter during their lives, and to defray all necessary plantation expenses, and reserving, as he afterwards does, certain appropriations for the negroes, a preacher and the repair of the chapel,) he directs that the whole of said yearly income be equally divided, share and share alike, between his three grand-sons, Wm. J., Dean M. and John F. Dunwoody, Mrs. J. A. Jones, Mary E. Dunwoody and his great grand-daughter, S. E. M. Shackelford.

Now we say that these devisees and legatees took a fee in the *corpus* of the "general estate," because the whole "annual income" is given to them and their heirs forever, viz: indefinitely and without limitation of time, and without any disposition over, of the capital, to any one else; and that the interest in the same vests absolutely and immediately, the possession only being postponed until the termination of the two life incumbrances charged thereon; and that inasmuch as the other charges or reservations, that is, the annual payment of $5 to each slave, of $100 to a preacher and the repairs to be done to the church, required *a perpetuity* to support them, they are illegal and fall to the ground; and that upon the death of Mrs. Smith and Mrs. Dunwoody, the whole estate vests, both in interest and possession, in the six designated devisees and legatees. If the whole income of the estate is given to them in fee, and there is no legitimate pur-

pose of the will which requires the executors to hold this es-- tate in trust after the death of the life annuitants, is not this- result inevitable ?    It is a familiar principle, that the trust term devised to executors, cannot continue so as to retain the legal estate in them a moment longer than is necessary to enable them to perform the objects of the trust, so far as the same are valid and can be carried into effect, according to the rules of law.    For however long a period the estate may be nominally devised to them, by the terms of the will, whenever the legitimate purposes for which an express trust has been created ceases or has been accomplished, the estate of the trustees must terminate.    Moreover, it is equally well set- tled, that although some of the objects for which a trust term has been created, may be invalid, if any of the purposes for which the trust is created are valid, the trust must continue in the executors so long as it is necessary to execute those which are legal.    Authority need not be cited in support of these elementary doctrines ; they commend themselves to the approval of every lawyer.

Our conclusion, then, upon this point is, that inasmuch as- the principal and interest cannot be separated, both must be kept together in the executors, just so long as the will made it necessary to carry out the legitimate purposes of the will ; yet, these being effectuated, the entire estate is transferred, by operation of law, *eo instanti,* to the six devisees and legatees of the testator.

Suppose the testator had said, I give the whole of my es- -tate, real and personal, to my five grand-children and great grand-child, to them and their heirs forever ; and had then directed the estate to be kept together by the executors for the purpose of paying annually, out of the rents, issues and profits thereof, the small charitable bequests contained in the will ?    The perpetuity clause, would, of course, be void, be- cause contrary to the rules of law.    But would the fee, pre- viously given, be thereby defeated ?    Such a proposition will

not be seriously maintained. And yet this, to all intents and purposes, is the case before us.

To all this it is said, we admit the rule, that the gift of income is a gift of the principal; but that this is no arbitrary rule, adopted either from convenience or policy, but one founded in reason, which is, that such was the intention of the testator. And it is broadly asserted "that it is not in the power of a Court to adopt a rule by which to compel a testator to give more than he desires to give."

Grant that the reason here assigned for the rule is correctly stated, and that it is true, as insisted by Counsel for defendants in error, that the question of intention can only arise where there is doubt as to the quantity or duration of interest designed to be given ; and admit further, what is undoubtedly true in point of fact, that the testator, Mr. Smith, did not *intend* that the *corpus* of this estate should ever come to the possession of the persons to whom the income is bequeathed, does it follow that the devisees and legatees could not take an absolute estate in the capital ? And is it true, that it is not in the power of the Court to adopt a rule by which to compel a testator to give more than he desires to give ?

What estate did Leonard Fretwell *intend* to give to Mary Fretwell, his daughter ? (1 *Kelly* 97.) He said in his will, that he gave her an estate for the term of her natural life in the property therein mentioned. But the Courts adopted a rule by which they compelled the testator to give his said daughter an absolute fee in Lydia, Cloe, Lucy and Joe. How much stronger that assumption of power which would convert an estate for life into a fee, than that which would, contrary to the intention of the testator, unite the *corpus* and income in the legatee ! In the one case, it is a total change of the quantity of estate *intended* to be given : in the other, the estate devised is the same, and the dispositive scheme is altered only as to the mode of enjoyment. A father gives the whole of his estate to his daughter, provided she remains single ; and if she marries, then over to some other person. The daughter marries, and yet retains the estate, contrary to the

express intention of the testator, the Courts holding that the will is *contra libertatem matrimonii.*

So long as a testator does not infringe the rules of law, he has a right to say, with Staberius, when he imposed an unpalatable condition in his will: *Sive ego prave seu recte, hoc volui.* But if he proposes doing an illegal act—as creating a perpetuity, or uses words to create one estate, when he designed another; in these and innumerable other cases which might be cited, his intentions will be defeated. How frequently are Courts obliged to say, in the construction of wills, in conflicts between intention and technical rules and expressions, *voluit sed non discit.*

And yet, after all in this case, no great violence is done to the intention of Mr. Smith. He intended his descendants to have the benefit of his estate; but from that pride so natural to man, or from some other motive, he was averse to see it divided and scattered. Hence, he directs it to be kept together by his executors; but this cannot be done. As was eloquently remarked by Chief Justice *Crew,* in the case of the *Earldom of Oxford,* (Sir *W. Jones' R.* 101,) "there must be an end of names and dignities and whatsoever is *tenure.*" As the objects of his bounty, then, could not enjoy the estate in the mode selected by the testator, lawfully and consistently, his general intent is to be carried into effect. And it is important only that this should prevail. The quantity of interest is the same, with the immaterial deductions carved out of the income heretofore noticed. And the only change is, that the legatees will severally manage their own property, instead of paying others to do it for them.

It only remains to notice the emancipation clause. The testator directs, that after his decease, an annual register shall be kept of all the births occurring on the estate—a record to be made of the same; and that every tenth negro born, at the age of 18 years, shall be delivered over to the Colonization Society, provided they see fit to accept of this provision in his will; otherwise, they are to remain in slavery.

We concur with Judge FLEMING in holding that this clause is void, because dependent upon the perpetuity section, which is, itself, void. But it is void for another reason. This testator having given these slaves absolutely to his grand-children and great grand-child, this direction for the manumission of one tenth of the future increase of these slaves, is repugnant to the rights of property in the legatees.

We know there are reported cases in the slave States, to the contrary of this. We believe, however, that they cannot be sustained on principle. For the law is positive, that conditions cannot be sustained, when they are repugnant to the estate granted, or infringe upon the essential enjoyment and independent rights of property, and tend manifestly to public inconvenience. This bequest is obvious to all these objections. The title to the mother of slaves, draws after it the title to the offspring. And a condition annexed to a conveyance in fee, or by devise, that the owner of female slaves, should set free every tenth child, is incompatible with the absolute rights appertaining to the estate in fee.

And what manifest inconvenience would result from any other doctrine? Slaves, like other personal property, pass without deed or writing. And what confusion would spring up, should it be held that subsequent vendees or donees, took the property saddled with this condition! Courts look with a hostile eye, upon all conditions and restraints upon the free and unincumbered exercise of the inherent rights of property; and let it not be said that the legatee voluntarily takes the property subject to the condition. So does the grantee, upon condition in his grant, that he shall not commit waste, nor his wife have dower in the estate conveyed. And yet, the law says, in all such cases, that the condition is repugnant and void; because unreasonable and in conflict with the nature of the estate conveyed.

The affection which prompted this will, is the most powerful principle implanted in the human breast. Indeed, the idea would be revolting to a savage, to take away the whole of this large estate from those who are descendants from the

testator's loins, and bestow one half of it upon his aged widow, on the brink of fourscore years, and who was but comparatively a short time the companion of the testator; and who, by the will of her two husbands, is abundantly provided for. These devisees and legatees were the principal objects of Mrs. Smith's regard, and had, of all other persons, the highest reason to expect his favor and bounty. He would have been justly chargeable with cruelty had he disappointed them. For, says *Rutherforth* in his justly celebrated *Institutes on Natural Law*, (*p.* 117,) " what we say of children in the first degree of descent, may likewise be applied to those of the second or third degree ; that is, to a man's grand-children ; for it is the duty of the remote parent, as the remote cause of their existence, to make their life easy and comfortable, and to show them all the kindness in his power."

While we disclaim, then, all intention of making a will for Mr. Smith or any other one else, we will, God and the law helping us, do all we can in this and every other case, to give that direction to property which is agreeable to the best feelings, affections and reasons of mankind.